**Brenda G. EMMETT, Plaintiff,**

**v.**

**L.T.V. AEROSPACE AND DEFENSE COMPANY, Defendant.**

**Civ. No. 89–1121.**

United States District Court,
W.D. Arkansas,
El Dorado Division.

Feb. 25, 1992.

Jack Lassiter, for plaintiff.

Jamie Pratt, for defendant.

## MEMORANDUM OPINION

OREN HARRIS, Senior District Judge.

On August 19, 1991, a trial to the court was held on this action. At the close of the trial the case was taken under advisement and the parties were directed to submit briefs to the court. The court has received the briefs from the parties. This matter is ripe for determination.

The court heard testimony on the plaintiff's claims of sex discrimination, wrongful discharge, tort of outrageous conduct and intentional infliction of emotional distress against L.T.V. Aerospace and Defense Company ("L.T.V."). The court had previously dismissed the plaintiff's claims for age discrimination and defamation of character by an order dated June 25, 1991.[1]

## FACTUAL BACKGROUND

L.T.V. is a Delaware corporation with its principal place of business in East Camden Arkansas. L.T.V. was producing the multi-launch rocket system (MLRS) at the East Camden plant pursuant to a contract with the Department of Defense. The Department of Defense requires specific documentation of the necessary inspections on the rockets.

The plaintiff started working for L.T.V. in October of 1986 as a quality control inspector ("inspector"). She was promoted to the position of quality control supervisor in March of 1987. As a supervisor the plaintiff monitored between 6 and 10 inspectors who inspected the rockets and recorded the resulting data in log books. The inspections were done in various stations along an assembly line. Approximately 50 to 60 rockets passed through the assembly line each hour.

The incident that the defendant asserts as the justification for the plaintiff's termination occurred on March 11, 1988. The plaintiff was working as the supervisor on the third shift. The third shift worked from 10:30 p.m. until 7:00 a.m. The plaintiff was randomly checking the inspection stations when she discovered that no inspections had been done at Station 937. The plaintiff later learned that Carol Johnson, the inspector who should have been making inspections at Station 937, misunderstood her assignment. Approximately 60 rockets passed through the assembly line without the necessary inspections. Three separate inspections should have been done at Station 937.

The three items inspected at Station 937 were the fin restraint, the paint job and detint. The width of the fin restraint was measured with a special tool and the dimensions of the measurement were entered into a log book. The paint job was visually observed. The time, date and a stamp were entered in a log book after the paint job observation. The detint inspection also involved a visual observation. The time of the detint inspection was entered into a log book. The detint is a small bracket that holds the rocket in place when it is inserted into a launch tube. The bracket keeps the rocket stationary until the rocket is fired.

After discovering that the inspections had been missed the plaintiff took remedial steps. The plaintiff entered her name and estimated dimensions in the inspection log book.[2] She had previously been advised by

---

1. The parties filed a Joint Stipulation for Partial Dismissal without Prejudice on June 21, 1991, requesting that the plaintiff's claim under the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq. and the state law claim for defamation of character be dismissed.

2. The plaintiff testified about her actions after determining that the inspections were not done.

"I immediately took my own caliper and went around and checked all the rockets that I could find in the building that had not been put into the launch tube, the ones that I could still actu-

her superiors that deficiencies in the log book would lead to termination for the responsible party.

After she made the entry in the log book she contacted Bill Lee, her supervisor. The plaintiff testified that she called Lee at home at 8:00 a.m. Lee said that she should add the words "for verification only" next to her log book entry. The plaintiff stated that she tried to contact the engineer on duty before taking any action, but was unable to find him.

Lee testified at trial that he did not know of any false entries in the log book. Lee stated that the plaintiff never told him about the estimated dimensions that she entered into the log book and that he was told only about missed inspections. Lee indicated that he told the plaintiff to write "for verification only" in the log book to show that the inspections were not done. Lee conceded that he forgot to take further action on the missed inspections after his conversation with the plaintiff.

The plaintiff testified that in the weeks after this incident occurred she asked Bill Lee several times about the log book entries and he replied that she would not lose her job. At trial Lee denied any such discussions with the plaintiff about the missed inspections. In June of 1988 L.T.V. began to investigate the incident. The plaintiff participated in a meeting with Norm Anderson, L.T.V.'s Personnel Manager, and Art Carr, the Director of Quality Assurance. She was informed that the matter was under investigation.

On June 15, 1988, the plaintiff was forced to resign. She was accused of falsifying government and L.T.V. records. Her resignation was witnessed by Bill Stanley, Employee Relations Manager, and Otis Tramble, Employee Relation Representative for second shift.[3]

Bill Lee, the plaintiff's supervisor, received a written warning due to his conduct on the missed inspections. Lee was not terminated. The warning, dated June 15, 1988, was signed by Lee, Art Carr and Norm Anderson. Lee's actions were characterized as "far below what is expected of a manager." The warning indicated that Carr and Anderson believed that Lee did not know about the plaintiff's "falsification" of records.

The plaintiff has been unemployed or underemployed since her termination. The plaintiff testified that she was unable to get other employment with companies in East Camden due to her resignation from L.T.V.[4] The plaintiff received unemployment compensation for one year at the rate of $204.00 each week. The plaintiff took a part-time job as a cook for the Hushpuppy restaurant in Camden in July of 1989. She worked 4–6 hours a day for 5 days each week. She started at $4.00 per hour and was raised to $5.00 per hour. The plaintiff quit her job with the Hushpuppy restaurant in July of 1991.

## SEX DISCRIMINATION

■ The burden of proof is upon the plaintiff to establish a prima facie case of discrimination. Then, if the plaintiff has met this burden the defendant attempts to show a legitimate, nondiscriminatory reason for the plaintiff's termination. Finally, the plaintiff must demonstrate that the alleged nondiscriminatory reason is pretextu-

---

ally go up and inspect, to ensure that the fin restraint was still in proper calibration, the tool was working properly, and I found none in-house prior to that, nor after that.

I went back and looked at all of second shift's records. The fin restraint crimper was still in proper working condition, they found no variables in their dimensions. I found no variables in any of my dimensions that I took.

I then went to the logbook, I entered my name for the two hour checks that was missed. I entered, I estimated the dimensions that would have been for that rocket according to all of the dimensions that I had gathered." (Trial Transcript page 30).

3. The letter of resignation signed by the plaintiff was introduced at trial as plaintiff's exhibit "J". It was dated June 15, 1988, and stated: "I resigned from L.T.V. corp. because of various reasons which are beyond my self control. I do not want to do this but I have no alternative."

4. The plaintiff testified that she applied with International Paper Company in Camden, Al-Co-Tel Company in Fordyce, Brunswick ARC, and other companies in the area.

al in nature.[5] The ultimate burden to show discrimination is on the plaintiff.

■ The basis of the plaintiff's claim of sex discrimination is that she was treated differently from Bill Lee because of her gender. The plaintiff was fired for entering the estimated measurements in the log book. Lee was given a written warning for advising the plaintiff to write "for verification only" in the log book and taking no further action to remedy the problem. The plaintiff also notes that a less senior, male employee named Barry Bray assumed her position after her termination.

The plaintiff is female, qualified for her position and was terminated. The plaintiff demonstrated that she was treated differently from a male employee whose conduct was similar and that she was replaced with a male. The parties stipulated that LTV's percentage of female supervisors was below the percentage of females in the Ouachita County work force.[6] The court specifically finds that the plaintiff has established a prima facie case of discrimination.

> A prima facie case of discrimination consists of proof that the plaintiff is a member of a protected class, and that an adverse employment action was taken against the plaintiff in circumstances from which an inference of unlawful discrimination arises. [citations omitted] An inference of discrimination is commonly raised in these cases by proving disparate treatment. A plaintiff proves disparate treatment by showing that he was treated less favorably than similarly situated employees who are not in plaintiff's protected class.

*Johnson v. Legal Services of Arkansas, Inc.,* 813 F.2d 893, 896 (8th Cir.1987); *See Brousard–Norcross v. Augustana College Ass'n,* 935 F.2d 974 (8th Cir.1991); *Bennett v. Hot Springs County Sheriff's Dept.,* 838 F.2d 291 (8th Cir.1988).

■ The defendant has asserted a legitimate, nondiscriminatory reason for terminating the plaintiff and not terminating Bill Lee. It seems that in L.T.V.'s view the plaintiff has committed the sin of commission while Lee committed the sin of omission. According to L.T.V., the plaintiff was guilty of dishonesty and Lee was guilty of incompetency.

The plaintiff claims that she informed Bill Lee of the estimated dimensions that she recorded in the log book. Lee testified that she never mentioned any false entries. (TR. 138)

Art Carr, the director of quality assurance, conducted an investigation of the missed inspections. Carr testified at trial that the plaintiff admitted in an interview conducted during the investigation that she had not told Bill Lee about making false entries in the log book. (TR. 160)

Carr was asked at trial why he recommended termination for the plaintiff and a written warning for Bill Lee. Carr responded that: "Ms. Emmett had falsified records; Mr. Lee had just not performed his job as expected." (TR. 162–63) Carr characterized Lee's written warning as one step short of termination.

■ The defendant has asserted a legitimate, nondiscriminatory reason for the termination of the plaintiff. It is incumbent upon the plaintiff to show by a preponderance of the evidence that the defendant's explanation for her termination was mere pretext for discrimination. *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981). Pretext may be demonstrated "directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *U.S. Postal Service Bd. of Govs. v. Aikens,* 460 U.S. 711, 716, 103 S.Ct. 1478, 1482, 75

---

5. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

6. Both parties stipulated to the following figures. The female population of Ouachita County is 44.27% of the total population. In 1987, 27% of L.T.V.'s quality control supervisors were female. In 1988, 37% of the quality control supervisors were female. In 1989, 28% of the quality control supervisors were female.

L.Ed.2d 403 (1983); quoting *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095.

■ The court specifically finds that the plaintiff has failed to demonstrate that the reason for her termination asserted by the defendant was pretextual in nature. The plaintiff has failed to rebut the credible testimony of the defendant's witnesses that she falsified company and government records in violation of company policy. Bill Lee did not falsify records. His "poor performance" equalled negligence, but remained a tier below the conduct of the plaintiff in the defendant's judgment. "While an employer's judgment may seem poor or erroneous to outsiders, the relevant question is simply whether the given reason was pretext for illegal discrimination." *Clay v. Hyatt Regency Hotel*, 724 F.2d 721, 725 (8th Cir.1984); *Saunders v. Southland Corp.*, 779 F.Supp. 1009, 1015 (E.D.Mo.1991). The plaintiff has not proved that her gender played any role in the decision of L.T.V. to terminate her. A judgment should be entered for the defendant on the claim of sex discrimination.

### STATE CLAIMS

■ The plaintiff also asserted claims of wrongful discharge (in violation of public policy), intentional infliction of emotional distress and the tort of outrageous conduct. The plaintiffs proof is insufficient to prevail on any of these claims. L.T.V. had a legitimate, nondiscriminatory reason for the plaintiff's termination. The plaintiff has not produced any credible evidence that she was terminated for being a "whistleblower" or that her termination violated public policy.

The record before this court does not justify a claim for intentional infliction of emotional distress or the tort of outrage. L.T.V. is not liable for the emotional distress of the plaintiff because it had a legal right to terminate her. *M.B.M. Co. v. Counce*, 268 Ark. 269, 281, 596 S.W.2d 681, 688 (1989).

In *Puckett v. Cook*, 864 F.2d 619 (8th Cir.1989) the Eighth Circuit held that under Arkansas law one is subject to liability for the tort of outrage for willfully or wantonly causing severe emotional distress through actions "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." 864 F.2d at 622; quoting *M.B.M. Co. v. Counce*, 268 Ark. at 280, 596 S.W.2d at 687. The plaintiff's proof falls far short of this standard. The conduct of the defendant in obtaining the resignation of the plaintiff was subdued and professional. The record is bare of any outrageous conduct on the part of the defendant. A judgment should be entered in favor of the defendant on the claims of wrongful discharge (in violation of public policy), intentional infliction of emotional distress and the tort of outrageous conduct.